U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED - LAKE CHARLES

DEC 15 2008

ROBERT H. SHEMWELL, CLERK
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### LAKE CHARLES DIVISION

| | | |
|---|---|---|
| LUANA M. MARAVI, as a natural tutrix of her minor child, AARON B. SMITH | : | DOCKET NO. 2:05 CV 1917 |
| VS. | : | JUDGE MINALDI |
| UNITED STATES OF AMERICA | : | MAGISTRATE JUDGE KAY |

## OPINION

The plaintiff, Luana M. Maravi brought this suit as natural tutrix of her minor child, Aaron B. Smith, pursuant to pursuant to the Federal Tort Claims Act (hereinafter "FTCA"), 28 U.S.C. § 2671, *et seq.*, against the United States of America. This Court presided over a bench trial commencing on October 27, 2008.

## FINDINGS OF FACTS

This Court hereby enters the following findings of fact and conclusions of law. To the extent that any finding of fact constitutes a conclusion of law, the Court hereby adopts it as such, and to the extent that any conclusion of law constitutes a finding of fact, the Court hereby adopts it as such.

### A.) Background

On May 21, 2004, Mirko Maravi brought his stepson Aaron to the Fort Polk Army Base's fifty meter pool. At the time, Aaron was seven years old and a non-swimmer. Mr. Maravi also brought Aaron's siblings Matthew, age eleven, Nicholas, age six, and Destiny, age four. Mr. Maravi then left the three boys on a bench near the shallow end of the pool and took Destiny with him. Mr. Maravi instructed the boys to wait for him on the bench. Aaron then fell into the shallow end of the

1

pool and suffered a near drowning incident.[1]

### B.) The Near Drowning Incident

Brittany Thomas was the lifeguard on duty at the shallow end of the pool where the drowning incident occurred. Later that day, Brittany Thomas gave a statement to the Fort Polk police.[2] She said she saw a little boy laying at the bottom of the pool and she asked one of his friends if he was ok.[3] She stated that one boy pulled him out when she noticed he was limp, at which point she activated the pool's Emergency Action Plan (hereinafter "EAP") by blowing her whistle three times, jumped out of the stand, helped a man pull the boy out, rolled Aaron to his side, and returned to her stand to retrieve her rescue mask.[4]

Brittany Thomas testified at trial that she was performing her "scanning" duties when she noticed Aaron on the bottom of the pool. After someone pulled him up, she realized he was limp and activated the EAP by blowing her whistle three times and coming down from her lifeguard stand. She assisted the man who was rescuing Aaron, later identified as Mark Cernigliaro, in rolling Aaron onto his side. She testified that by then there was a doctor there who began administering rescue breathing. She went back to her stand to get the rescue breathing mask. She further testified that

---

[1] At trial, both parties presented extensive evidence as to the causation and extent of Aaron's subsequent injuries. Because this Court finds in favor of the United States and therefore does not award Ms. Maravi any damages, it is unnecessary to examine the extent of Aaron's injuries and the expense of the care those injuries require.

[2] Pl.'s Ex. 6 (Brittany Thomas police statement).

[3] *Id.*

[4] *Id.* In a one-paragraph handwritten statement Brittany Thomas gave immediately after the incident, she states that she grabbed Aaron's arm and helped roll him to his side. Pl.'s Ex. 5 (Brittany Thomas handwritten statement). Then, a doctor (Dr. King) asked for her rescue mask, and she went back to her stand to retrieve the mask. *Id.*

2

once a doctor arrived, she was required to defer to the doctor and was not allowed to touch the victim any longer. Brittany Thomas also stated that, prior to noticing Aaron on the pool floor, she did not hear anyone ask for help and that she would not have ignored someone who said a patron was drowning.

According to the deposition testimony of Mark Cernigliaro, he was swimming laps when he saw Aaron at the feet of a group of girls.[5] Mr. Cernigliaro testified that before he saw Aaron, he had not heard anyone yelling or screaming for help.[6] Mr. Cernigliaro then stopped and asked the children if the boy was playing, as he had frequently observed children doing.[7] Two boys came up and said "he told me he was just playing," but when the boys grabbed him his head flapped around.[8] During this time, Mr. Cernigliaro testified that he made eye contact with Ms. Thomas, who was at this point coming down the lifeguard stand stairs, and she was aware that he was checking on Aaron.[9]

When Mr. Cernigliaro saw that the boy was limp, he pulled Aaron up and carried him to the side of the pool.[10] No one helped him carry Aaron to the side of the pool.[11] As he laid him down at the side of the pool, Ms. Thomas was on the deck blowing her whistle and alerting the other

---

[5] Mark Cernigliaro Dep. (Oct. 24, 2008), p. 17.

[6] *Id.* at 17.

[7] *Id.* at 20.

[8] *Id.* at 21-22.

[9] *Id.*

[10] *Id.*

[11] *Id.* at 23.

lifeguards of the situation.[12] Lifeguards came running and two doctors appeared.[13] Mr. Cernigliaro testified that all of this "happened so fast, they all got there...instantaneously, pretty much."[14] Mr. Cernigliaro said that within "seconds" of him laying Aaron on the ground, the two doctors arrived.[15] One of the doctors began performing CPR.[16] Ms. Thomas was there as Mr. Cernigliaro retrieved Aaron from the pool, and other lifeguards soon appeared.[17]

Dr. Kevin King testified via deposition that he did not know who pulled Aaron out of the water, but there were two or three people assisting Aaron when he came over.[18] Dr. King came over and began rescue breathing.[19] He further testified that he gave approximately three rescue breaths before someone brought a resuscitation bag for him to use.[20] Dr. King performed resuscitation for approximately five minutes until the paramedics arrived, at which point Aaron was transported to a local hospital.[21]

Jean Wadman testified at trial, and her accident report of May 21, 2004 was also submitted

---

[12] *Id.* at 23-24.

[13] *Id.* at 23.

[14] *Id.* at 24.

[15] *Id.* at 25.

[16] *Id.*

[17] *Id.* at 26.

[18] Dr. Kevin King Dep. (Sept. 25, 2007), p. 11.

[19] *Id.*

[20] *Id.* at 12.

[21] *Id.* at 14.

4

as evidence.[22] In her accident report, Ms. Wadman stated that she was observing the pool when Brittany Thomas blew her whistle three times and pointed to the pool below the stand, and got down off of her stand.[23] Ms. Wadman stated that Brittany Thomas was activating the pool's EAP by blowing her whistle three times, pointing to the water, and climbing down.[24] Ms. Wadman further stated that Brittany Thomas, in activating the EAP while a patron rescued Aaron, saved valuable time because the rescue was made as she climbed off the stand, which is sooner than it would have been made had Brittany Thomas climbed down the stand and performed the rescue herself.[25]

Ms. Wadman's final conclusion in the accident report was that Brittany Thomas activated the EAP, Jerome Jackson pulled Aaron out of the water and put him onto the deck, Brittany Thomas helped pull Aaron onto his side, Dr. King performed CPR, Brittany retrieved the rescue mask, Jean Wadman called 911, and EMS arrived about five minutes after Aaron was pulled from the pool.[26] Ms. Wadman's testimony at trial was consistent with her accident report as to the actions of the Government employees.

Erika Seiler was at the pool with her children and Carolyn King, Dr. King's wife, on May 21, 2004.[27] She recalls seeing a white male lift a "black, limp child" out of the pool.[28] She did not

---

[22] Pl.'s Ex. 2 (Jean Wadman Accident Report).

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] Erika Seiler Dep. (June 5, 2007), p. 7.

[28] *Id.* Karen King, attorney for the United States, misspoke in her closing argument when she stated Erika Seiler testified that she saw a white female lift Aaron out of the water. Lee

5

recall whether Brittany Thomas blew her whistle.[29] She testified that she did not see a black child jump into the pool and rescue Aaron, and that she did not hear a lifeguard instruct someone to rescue Aaron.[30]

Carol Sickles was a lifeguard on duty on May 21, 2004. She first noticed something was wrong when she heard three whistle blows.[31] Allissa Surran, another lifeguard on duty on May 21, 2004, also reported hearing three whistle blows.[32] She stated that Jean Wadman instructed her to open the gate for the EMS, which she did.[33]

Zoe Dauser testified via deposition that she was swimming when she felt Aaron at the bottom of the pool.[34] She stated she waved to the lifeguard and said "he's drowning," and the lifeguard "put her hand up at me like I was faking it or playing with her."[35] According to Zoe, who was eight years old at the time, the lifeguard, Brittany Thomas, did this again.[36] Next, Jerome Jackson walked by,

---

Hoffoss, Ms. Maravi's attorney, argued in rebuttal that this Court should discredit Erika Seiler's testimony because no other witness reported that a white female performed the rescue. Erika Seiler's deposition testimony clearly states that she "remembered seeing a white male...he had a black limp child that he was lifting up out of the water and setting on the side of the pool." *Id.*

[29] *Id.* at 8.

[30] *Id.* at 12.

[31] Carol Sickles Dep. (June 6, 2007), p. 17.

[32] Allissa Surran Dep. (Sept. 25, 2007), p. 20

[33] *Id.* at 21.

[34] Zoe Dauser Dep. (Jan. 18, 2008), p. 14.

[35] *Id.* at 17.

[36] *Id.*

and according to Zoe, Jerome alone pulled Aaron from the pool.[37] According to Zoe, Ms. Thomas looked over at Aaron, started crying, and ran the other way.[38] Zoe did not recall Ms. Thomas blowing her whistle.[39] She testified that she did not believe it was possible that a white man swimming laps rescued Aaron, because Jerome, a black youth, rescued Aaron.[40] She also did not remember any doctor performing CPR.[41]

According to Jerome Jackson, who was thirteen at the time, he was walking between the baby and regular pool when he saw girls playing, and a lifeguard (Brittany Thomas) told him that a kid (Aaron) was under water for too long, but she wasn't sure how long.[42] Jerome stated that after awhile, both the kids and the lifeguard panicked, and he dove under water and pulled Aaron out of the water and put him on the ledge.[43] Jerome also testified that the female lifeguard blew her whistle and ran toward the deep end of the pool, away from Aaron, who was near the shallow end.[44] Jerome stated that he alone was responsible for pulling Aaron out of the pool.[45] Jerome also testified that

---

[37] *Id.*

[38] *Id.* at 20.

[39] *Id.* at 22.

[40] *Id.* at 32.

[41] *Id.* at 36.

[42] Jerome Jackson Dep. (Jan. 10, 2008), pp. 18-19.

[43] *Id.* at 21.

[44] *Id.* at 22-23; 51.

[45] *Id.* at 28.

the female lifeguard came over to Aaron.[46]

Jerome further testified that the lifeguard asked him if he could check on Aaron.[47] On cross-examination, Jerome stated "as soon as" Jerome set Aaron down on the ledge, the female lifeguard blew her whistle.[48] Jerome further stated that she "ran somewhere" and came back with a little box with the mask for rescue breathing.[49] At this point, Jerome stated that there was a doctor performing rescue breathing.

This case required the Court to weigh often conflicting testimony from several eyewitnesses and make credibility determinations. Having carefully considered all of the evidence presented, both through live witness testimony and through deposition testimony, exhibits, and sworn statements, this Court has made credibility determinations and accepts the defendant's version of the events of May 21, 2004 as credible. There is no corroborating testimony to support Zoe Dauser's statement that Ms. Thomas ignored Aaron and failed to blow her whistle. Jerome Jackson, Dr. King, Mark Cernigliaro, Jean Wadman, Carol Sickles, and Brittany Thomas all testified that Brittany Thomas, or the "female lifeguard," blew her whistle. Notably, the lifeguards, who are specially trained to listen for such warnings, all testified that Brittany Thomas blew her whistle three times, which is the signal to activate the pool's EAP.

This Court also finds that Mark Cernigliaro pulled Aaron out of the water while Brittany Thomas activated the EAP, went to the deck, checked on Aaron, and left to retrieve her rescue mask,

---

[46] *Id.* at 52.

[47] *Id.* at 30.

[48] *Id.* at 57.

[49] *Id.* at 57-58.

which she provided to Dr. King as he performed rescue breathing. Dr. King, with Dr. Seiler assisting, performed rescue breathing for approximately five minutes, or until the EMS arrived. At the same time, Jean Wadman called 911 and instructed lifeguard Carol Sickles to wait by gate for the EMS. The EMS arrived in approximately five minutes and transported Aaron to the hospital.

## CONCLUSIONS OF LAW

Ms. Maravi has alleged that the United States, through its employees at the pool, was negligent and failed to meet the appropriate standard of care when responding to Aaron's near drowning incident. Ms. Maravi further alleges that, due to Aaron's near drowning incident, he now suffers numerous behavioral and psychological problems that will require treatment for an infinite period of time.

### A.) Jurisdiction

Jurisdiction arises pursuant to the FTCA, 28 U.S.C. § 2671 *et seq.*, and 28 U.S.C. § 1346(b)(1).

### B.) Applicable Law

"Under the FTCA, the United States is liable in the same manner and to the same extent as a private individual under like circumstances." *Kennedy v. United States*, 750 F. Supp. 206, 210 (W.D. La. 1990). "The appropriate law to follow in determining liability under the FTCA is the law of Louisiana, where the negligent act is alleged to have occurred." *Id.*

### C.) Standard of Care

In Louisiana, negligence arises under La. Civ. Code Ann. articles 2315 and 2316. To recover for negligence in Louisiana, a plaintiff must demonstrate:

> (1) proof that the defendant had a duty to conform his conduct to a

specific standard (the duty element); (2) proof that the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) proof that the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) proof that the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) proof of actual damages (the damages element).

As the Louisiana Supreme Court stated in *Williams v. City of Baton Rouge*, 214 So.2d 138, 143 (La. 1968):

> [t]he duty of care a lifeguard owes to patrons at a public swimming pool to be more than the standard of care required of ordinary persons. A lifeguard, by training and experience, is expected to be prepared at a moment's notice to rush to the rescue of those in danger of drowning. His is not an obligation which can be discharged by inattention to the activity in the pool and a lack of the awareness of the serious nature of the responsibility imposed upon the position.

"A lifeguard has a duty to maintain order in the pool for patron's safety and to respond quickly and appropriately to swimmers in danger." *Jolivette v. City of Lafayette*, 408 So.2d 309, 313 (La. App. 3d Cir. 1981). In negligence actions, the plaintiff bears the burden of proving by a preponderance of the evidence the standard of care, breach, causation, and damages. *Benjamin ex rel. v. Housing Authority of New Orleans*, 04-1058 (La. 12/1/04); 893 So.2d 1, 4. "Proof is sufficient to constitute a preponderance when the entirety of the evidence, both direct and circumstantial, shows that the fact sought to be proved is more probable than not." *Id.* at 4-5.

Based upon the aforementioned findings of fact and the applicable law, this Court finds that Ms. Maravi has not met her burden of proving it is more likely than not that the United States, through its employees, failed to conform to the appropriate standard of care. This case requires this Court to determine the credibility of eyewitness testimony. Having carefully considered all of the evidence presented, this Court finds that the Government conformed to the applicable standard of
10

care on May 21, 2004.

As stated above, this Court finds that Brittany Thomas was properly scanning the pool, and that she correctly activated the EAP when she realized that Aaron was passively drowning. By blowing her whistle three times and pointing, Brittany Thomas activated the EAP in accordance with pool procedure. According to testimony, the fact that another patron and not the lifeguard initiated Aaron's retrieval from the pool served to expedite the rescue, as Aaron was out of the pool by the time Ms. Thomas climbed down from her stand. Moreover, Ms. Thomas prudently deferred the administration of CPR to a trained medical professional. According to testimony at trial, lifeguards are supposed to step aside and permit a medical professional, such as Dr. King, perform rescue breathing if a medical professional is available. The other pool employees similarly conformed to the applicable standard of care when the EAP was activated. Jean Wadman called 911, and the EMS arrived within five minutes. Allissa Surran waited at the gate for the EMS. Accordingly, no employee of the United States was negligent, and this Court therefore finds that the defendant is not liable.

## CONCLUSION

Based on the findings of fact and conclusions of law stated in this Opinion, this Court finds in favor of the United States and against Ms. Maravi.

Lake Charles, Louisiana, this 13 day of December, 2008.

PATRICIA MINALDI
UNITED STATES DISTRICT JUDGE